UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARTIN DESMOND

           Plaintiff,

    v.

ALBERTO R. GONZALES,
      U.S. ATTORNEY GENERAL,
      U.S. DEPARTMENT OF JUSTICE

          Defendant.

Civil Action No. 03–1729 (CKK)

**MEMORANDUM OPINION**
(January 17, 2006)

Plaintiff Martin Desmond, a former employee of the Federal Bureau of Investigation ("FBI") and participant in the FBI New Agent Training ("NAT") program, brought suit against Defendant Alberto Gonzales, U.S. Attorney General, U.S. Department of Justice ("DOJ"), alleging that the FBI subjected Plaintiff to discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* Plaintiff claims both that he suffers from Post-Traumatic Stress Disorder ("PTSD") and that Defendant was aware that Plaintiff was disabled and regarded him as disabled. 1st Am. Compl. ¶¶ 62, 64. Plaintiff specifically alleges that Defendant discriminated against Plaintiff by criticizing his performance without justification, by subjecting him to a performance investigation without justification, by refusing to allow him to graduate from the FBI Academy despite his successful completion of coursework and training, and by terminating him from the position of Special Agent. 1st Am. Compl. ¶ 68. Plaintiff also alleges that Defendant retaliated against Plaintiff after learning that Plaintiff filed a charge of discrimination by instructing him that he would be required to undergo specialized testing, by

refusing to allow him to graduate from the FBI Academy, and by terminating him from the position of Special Agent.  1st Am. Compl. ¶ 72.

Defendant filed the motion pending before the Court, [49] Defendant's Motion for Summary Judgment, on April 8, 2005.  Plaintiff filed [58] Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Redacted Version) on May 31, 2005.  Defendant filed [62] Memorandum of Points and Authorities in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment on June 27, 2005.  After considering the aforementioned motions, the operative complaint, and the relevant case law, the Court shall GRANT IN PART Defendant's Motion for Summary Judgment on Plaintiff's claims that Defendant discriminated against him by criticizing his performance, subjecting him to a performance investigation, refusing to allow him to graduate from the FBI Academy, and terminating him from the position of Special Agent; and DENY IN PART Defendant's Motion for Summary Judgment on Plaintiff's claims that Defendant retaliated against Plaintiff by instructing him that he would be required to undergo specialized testing, refusing to allow him to graduate from the FBI Academy, and by terminating Plaintiff from the position of Special Agent based on factual disputes.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)).  The local rules for summary judgment "assis[t] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively."  *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996).  "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the

rule's purposes. . . .  The procedure contemplated by the rule thus isolates the facts that the

parties assert are material, distinguishes disputed from undisputed facts, and identifies the

pertinent parts of the record."  *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)).

"[A] district court should not be obliged to sift through hundreds of pages of depositions,

affidavits, and interrogatories in order to make [its] own analysis and determination of what may,

or may not, be a genuine issue of material fact."  *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421,

1425 (D.C. Cir. 1988)).  As such, in resolving the present summary judgment motion, this Court

"assume[s] that facts identified by the moving party in its statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues file[d] in

opposition to the motion."  LCvR 56.1; 7(h).  The Court also cites directly to the record, where

appropriate, to provide additional information not covered in either of the Parties' statements.

The Court finds the following facts to be both material and undisputed unless otherwise

indicated:

### A.  Plaintiff's Application and Appointment to become an FBI Special Agent

In 1997, Plaintiff began working for the FBI as a Financial Assistant in Cleveland, Ohio.

Defendant's Statement of Material Facts as to which there is No Genuine Issue ("Def.'s Stmt.") ¶

1; Plaintiff's Response to Defendant's Statement of Material Facts as to which there is No

Genuine Issue ("Pl.'s Resp.") ¶ 1.  Prior to accepting this job, Plaintiff had applied for the

position of FBI Special Agent, the application for which remained pending when he accepted the

Financial Assistant position.  Def.'s Stmt. ¶ 2; Pl.'s Resp. ¶ 2.  As part of that Special Agent

application, Plaintiff filled out an Applicant Checklist.  Def.'s Stmt. ¶ 3; Pl.'s Resp. ¶ 3.  Section

1(6) of the checklist reads as follows: "I am completely available for assignment anywhere in the

FBI's jurisdiction (The United States and Puerto Rico) at any time during my tenure with the

FBI," to which Plaintiff checked the box "Yes."  Def.'s Exh. 2 (App. checklist).  In August 1999,

Plaintiff was promoted to the position of Financial Analyst.  Plaintiff's Opposition to

Defendant's Motion for Summary Judgment (Redacted Version) ("Pl.'s Opp'n") at 3–4.

By letter dated December 28, 1999,[1] Plaintiff was informed that he had been appointed as

a Special Agent and assigned to New Agent Class ["NAC"] 00-06, which was to begin training at

the FBI Academy in Quantico, Virginia, on February 13, 2000.  Def.'s Stmt. ¶ 4; Pl.'s Resp. ¶ 4.

Plaintiff again was reminded that he could be assigned to anywhere in the United States or Puerto

Rico depending upon the needs of the FBI.  Def.'s Stmt. ¶ 5; Pl.'s Resp. ¶ 5; Def.'s Exh. 3 at 2

(Appt. Ltr.) ("You should understand that you are to proceed on orders to any part of the United

States or Puerto Rico where the exigencies of this Bureau may require, and you will continue to

be completely available for any assignment whenever and wherever the needs of the Bureau

demand.  Further, you cannot expect an assignment to an office of your own preference.").

Plaintiff signed a letter dated February 13, 2000, agreeing to be governed by the following

condition, among others: "I may be sent, on a temporary or permanent basis, to any part of the

continental or territorial United States that the exigencies of the Bureau's work may requre; that

my headquarters may be fixed in some jurisdiction other than which I have heretofore resided;

that my headquarters may be changed as the work of the Bureau may require and that no transfer

will be made from one station to another for personal reasons.  I accept this policy without any

---

[1] In 1997, prior to Plaintiff's appointment as FBI Special Agent, a relevant event occurred that Plaintiff cites as the basis for Plaintiff's later attempts to return to Cleveland, Ohio.  In December of 1997, while alone in his mother's home, Plaintiff was held at gunpoint and led around his mother's house by an armed robber, who was later revealed to be the "Tommy Hilfiger rapist," a man who had raped several women in the area.  The perpetrator was ultimately captured and sentenced.  Plaintiff's mother continued to live in the same home. 1st Am. Compl. ¶ 10.

reservation."  Def.'s Exh. 4.

> B.    NAC 00–06

Early during Plaintiff's time in NAC 00–06, Supervisory Special Agent ("SSA") Johnnie

Jacobs from the Transfer Unit at the FBI's Headquarters spoke at the Academy to NAC 00–06

about placement after the training program was completed, reiterating the aforementioned

conditions regarding placement.  Def.'s Stmt. ¶ 7; Pl.'s Resp. ¶ 7.  At some point, Plaintiff asked

Mr. Jacobs about a support-to-agent Initiative that provided for newly trained Special Agents

who formerly held support positions within the FBI to return to the office from which they had

come.  Def.'s Stmt. ¶ 8; Pl.'s Resp. ¶ 8.  Mr. Jacobs informed Plaintiff that the Initiative would

not apply to him.  Def.'s Stmt. ¶ 9; Def.'s Exh. 1 at 82 (Desmond Dep.) ("I asked him about the

support initiative that I had heard about, and asked if that applied to me. [Mr. Jacobs] said no.");

Def.'s Exh. 5/Pl.'s Exh. 2 at 51 (Jacobs Dep.).  Plaintiff was not selected for the position of

Special Agent under the support-to-agent Initiative.  Def.'s Exh. 1 at 84 (Desmond Dep.) ("I just

thought the initiative applied to the class, so I guess no, I wasn't selected under that initiative");

Def.'s Stmt. ¶ 10.  Mr. Jacobs suggested that Plaintiff attach to his ranking of preferred first-

office assignments a special request that would be considered by the Transfer Unit for a possible

"hardship transfer."  Def.'s Exh. 5/Pl.'s Exh. 2 at 51 (Jacobs Dep.); Pl.'s Ex. 1 at 29–30

(Desmond Decl.); Pl.'s Resp. ¶ 9.  Plaintiff submitted his assignment ranking list and attached a

special hardship request as suggested by Mr. Jacobs.  Pl.'s Resp. ¶ 9; Pl.'s Exh. 1 at 29–30

(Desmond Decl.).

While a member of NAC 00–06, Plaintiff broke his ankle and consequently was taken out

of the class, given time for his injury to heal, and "recycled" into NAC 00–08.  Def.'s Stmt. ¶¶

11, 12; Pl.'s Resp. ¶¶ 11, 12.  Plaintiff contends upon turning in his personal items at the time he

left the Academy to John Wills, Class Counselor for NAC 00–06, Mr. Wills informed Plaintiff

that any later class Plaintiff recycled into would be subject to the Initiative and Plaintiff would

thus be returned to the Cleveland Office.  Pl.'s Resp. ¶ 9; Pl.'s Exh. 1 ¶ 33 (Desmond Decl.).

Plaintiff further contends that while working in the Cleveland and Youngstown, Ohio FBI offices

as a Financial Analyst while rehabilitating his ankle, his supervisors in both offices "appeared to

be under the impression" that they believed that Plaintiff would be returned to Cleveland after his

training at the Academy due to the Initiative that would be in place.  Pl.'s Resp. ¶ 9; Pl.'s Exh. 1

¶ 35 (Desmond Decl.).  Defendant does not contest that these interactions transpired.

     *C.       NAC 00–08*

     Plaintiff returned to the FBI Academy in May 2000 as a member of NAC 00–08.  Def.'s

Stmt. ¶ 12; Pl.'s Resp. ¶ 12.  Plaintiff was given an FBI document upon his return to the

Academy pertaining to the following six "suitability" dimensions on which a new agent trainee

would be rated: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and

honesty and judgment.  Def.'s Exh. 6, attached, at 1–3 ("The above six dimensions will be

measured throughout all aspects of your training program at the FBI Academy, to include your

performance and progress in the four basic areas of instruction which are: 1) academics, 2)

firearms, 3) physical fitness/defensive tactics (PT/DT), and 4) practical applications.").  This

document informed Plaintiff that he would be subject to a two-year probationary period,

continually evaluated by staff and instructors, and that he could be removed from his Special

Agent position if found to be deficient in any of the suitability areas.  Def.'s Exh. 6, attached, at

1; Def.'s Stmt. ¶ 14; Pl.'s Resp. ¶ 14.

*1.      Plaintiff's Pre-Assignment Request to Return to Cleveland*

On his first day back at the Academy, Plaintiff informed SSA Cochran, Class Counselor

for NAC 00–08, that he wanted to return to the Cleveland division after graduation from the

Academy.  Def.'s Stmt. ¶ 15; Pl.'s Resp. ¶ 15 (contending that Mr. Cochran initiated this

conversation with Plaintiff about Plaintiff's personal situation at home).  Mr. Cochran instructed

Plaintiff that he could attach a written request regarding his preference to return to Cleveland to

his NAC 00–08 assignment preferences.  Pl.'s Exh. 3 at 15 (Cochran Dep.); Pl.'s Resp. ¶ 15.  Mr.

Cochran indicated that he did not know about the applicability of the Initiative to Plaintiff and

had already placed an inquiry with the Transfer Unit to this effect.  Pl.'s Exh. 3 at 14–15

(Cochran Dep.); Pl.'s Resp. ¶ 15.

Mr. Jacobs gave a presentation to NAC 00–08 regarding post-training placement.  Def.'s

Stmt. ¶ 16; Pl.'s Resp. ¶ 16.  During Mr. Jacobs's presentation, Plaintiff asked whether the

Initiative would apply to him; in response, Mr. Jacobs specifically stated to Plaintiff that the

support-to-agent Initiative would not apply to Plaintiff as he had been recycled into the class of

00–08.  Pl.'s Exh. 2 at 73 (Jacobs Dep.); Def.'s Exh. 1 at 92 (Desmond Dep.) ("I know that [Mr.

Jacobs] did say that it did not apply–that the Initiative did not apply to me.  He did specifically

state that . . . ."); Def.'s Stmt. ¶ 17.

Plaintiff submitted a "hardship transfer request" while in NAC 00–08, just as he had

while a member of NAC 00–06.  Def.'s Stmt. ¶ 19; Pl.'s Resp. ¶ 19.  Plaintiff's hardship transfer

request was attached to his "wish list" of offices to which he wanted to be assigned after

graduation; on his "wish list," Plaintiff listed Cleveland as his number one choice and Chicago as

his number six choice out of the fifty-six possible assignments.  Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶

20.  Plaintiff wanted to return to the Cleveland division because he was worried about his

mother's safety in light of the December 1997 incident; this concern was iterated in his request.

Def.'s Exh. 8 at 1; Def.'s Stmt. ¶ 18; Pl.'s Resp. ¶ 18.  The FBI denied Plaintiff's request for a

hardship transfer.  Pl.'s Resp. ¶ 21; Def.'s Stmt. ¶ 21 (maintaining that Plaintiff's hardship

request failed to qualify under the FBI policy for a hardship transfer).

> 2.    *Chicago Assignment and Post-Assignment Requests to Return to Cleveland*

On June 15, 2000, Plaintiff was assigned to work at the FBI's Chicago Field Office.

Def.'s Stmt. ¶ 22; Pl.'s Resp. ¶ 22.  Plaintiff claims that while he has experienced sleepnessness

since the December 1997 armed robbery, his sleeplessness was exacerbated upon receiving

orders in the following manner: before receiving orders while at the Academy, Plaintiff slept an

average of three to five hours a night; after receiving orders, Plaintiff began to sleep only two to

four hours each night.  Plaintiff claims that "[u]ntil he returned to Ohio on a permanent basis,

[Plaintiff] was unable to sleep more than four hours each night, and frequently received only two

or three hours of sleep."  Pl.'s Exh. 1 ¶ 48 (Desmond Decl.); *see also* Plaintiff's Statement of

Material Facts in Genuine Dispute ("Pl.'s Stmt.") ¶¶ 108–09.  Plaintiff stated that the "fear,

anxiety, and guilty from which [Plaintiff] had suffered since the Hilfiger Rapist incident [grew]

even stronger" upon learning of his orders to Chicago.  Pl.'s Exh. 1 ¶ 47 (Desmond Decl.).

On June 20, 2000, Mr. Cochran met with Plaintiff to discuss a perceived change in

demeanor after Plaintiff received his orders to report to Chicago upon graduation; Mr. Cochran

had observed Plaintiff when he received his orders and believed him to be upset.  Def.'s Stmt. ¶

23; Pl.'s Resp. ¶23 (denying that Mr. Cochran reprimanded or criticized Plaintiff for his

"perceived change in demeanor" or that this "perceived change in demeanor" provided grounds

for discipline or concern).  During this meeting, Mr. Cochran discussed his concern about issues

which he believed Plaintiff needed to address.  Def.'s Stmt. ¶ 23; Pl.'s Resp. ¶ 23 (denying this

statement to the extent that it asserts or suggests that other issues discussed with Plaintiff at this

time provided a legitimate ground for discipline or concern.).  The Court notes that what is

material about this conversation is uncontested by the parties, which is that various concerns

regarding Plaintiff's demeanor were discussed at this time–which was prior to the time that

Plaintiff learned of or relayed information to Defendant regarding his PTSD.  Plaintiff

subsequently asked Mr. Cochran about the possibility of being assigned to the FBI Pittsburgh

Field Office to fill a vacancy left when an agent who had been assigned there resigned, because it

was located closer to Cleveland than Chicago.  Def.'s Stmt. ¶ 24; Pl.'s Resp. ¶ 24; Def.'s Exh. 7

at 102 (Cochran Dep.).  Mr. Cochran addressed Plaintiff's request.  Def.'s Stmt. ¶ 24 (contending

that SSA Cochran informed Plaintiff that reassignment to the Pittsburgh office would not be

possible); Pl.'s Resp. ¶ 24 (contending that Mr. Cochran told Plaintiff that he would call the

Transfer Unit to inquire about Plaintiff's request).

     On July 28, 2000, Plaintiff placed an electronic communication on Mr. Cochran's desk

requesting that he be placed on the Cleveland Division Personnel Resource List [PRL].  Def.'s

Stmt. ¶ 25; Pl.'s Resp. ¶ 25.  When Mr. Cochran told Plaintiff that he could not be placed on the

PRL for Cleveland until after he arrived in Chicago, Plaintiff did not raise the issue again.  Def.'s

Exh. 7/Pl.'s Exh. 3 at 111 (Cochran Dep.); Pl.'s Resp. ¶ 25.

     In early August 2000, the nine-year-old child of a friend of Plaintiff's died.  Plaintiff,

understandably upset, asked for leave to attend the funeral, and his request was granted.  Def.'s

Stmt. ¶ 26; Pl.'s Resp. ¶ 26.  Around that time, a conversation took place between Mr. Cochran

and Plaintiff during which Plaintiff shared that coupled with his sadness about his friend's

child's death, he continued to experience strong concerns and feelings of guilt respecting his

mother's health and safety.  Def.'s Stmt. ¶ 27; Pl.'s Resp. ¶ 27.  Mr. Cochran asked how Plaintiff

was doing and what was bothering him, to which Plaintiff then responded that he did not feel

comfortable discussing personal issues but was assured by Mr. Cochran that their conversation

would be "off the record."  Def.'s Ex. 1 at 125–126 (Desmond Dep.); Pl.'s Resp. ¶ 27.  Plaintiff

states that Mr. Cochran then told Plaintiff that despite his dealing with a number of personal

problems, he continued to perform at a very high level, had fulfilled all of the requirements to

graduate at the end of the month, that his performance had actually improved as time went by,

and that he had received a laudatory e-mail from Plaintiff's White Collar Crime class instructor

about Plaintiff.  Pl.'s Resp. ¶ 27; Defendant does not contest this.  During this meeting, Mr.

Cochran recommended that Plaintiff seek the aid of staff at the Employee Assistance Program

[EAP].  Def.'s Stmt. ¶ 28; Pl.'s Resp. ¶ 28.

*3.      Post-Traumatic Stress Disorder*

Plaintiff met with EAP counselor Tom Lewis on August 9, 2000.  Mr. Lewis encouraged

Plaintiff to continue using writing, including writing letters, as a way to deal with stress as he had

done in the past.  Pl.'s Stmt. ¶ 16; Pl.'s Exh. 1 ¶ 57 (Desmond Decl.).  Plaintiff was told by EAP

that he was showing signs of PTSD.  Def.'s Stmt. ¶ 29; Pl.'s Resp. ¶ 29.

On August 14, 2000, Plaintiff contends that he informed Mr. Cochran that he had met

with EAP and had been given a diagnosis of PTSD.  Pl.'s Stmt. ¶ 17; Pl.'s Exh. 1 ¶ 58 (Desmond

Decl.).  Mr. Cochran denies this allegation.  Def.'s Exh. 7 at 127 (Cochran Dep.); Defendant's

10

Memorandum of Points and Authorities in Support of Defendant's Motion for Summary

Judgment ("Def.'s Memo.") at 8 n.1.  The Court will assume for the purposes of evaluating

Defendant's Motion for Summary Judgment that Mr. Cochran was informed by Plaintiff that

Plaintiff had been diagnosed with PTSD at this time.

> 4.      *Plaintiff's "Anonymous" Instructor Evaluations and Chicago Logistics Discussions*

On August 21, 2000, Plaintiff was called into Mr. Cochran's office regarding two

"anonymous" instructor evaluations that had been completed by Plaintiff.  Pl.'s Stmt. ¶ 21; Pl.'s

Exh. 1 ¶ 60 (Desmond Decl.).  Mr. Cochran said that he had discerned the evaluations to be

Plaintiff's based on his recognition of Plaintiff's handwriting.  Pl.'s Stmt. ¶ 21; Pl.'s Exh. 1 ¶ 60

(Desmond Decl.); Pl.'s Exh. 3 at 142–43 (Cochran Dep.).  Neither of the evaluations mentioned

Mr. Cochran by name.  Plaintiff's "anonymous" evaluation of Mr. McGinnis included the

following language: "Thanks for telling us about the stress and family issues, it meant a lot to a

least one student.  If only more people thought like you."  Pl.'s Exh. 1 at DM 1987.  The other

evaluation in question, Plaintiff's "anonymous" and positive evaluation of Mr. Burke, included

the following language:  "Ethics is a very important topic, and should be included in new agents'

classes.  However, it should also be a part of supervisors training.  Some of them need it more

than new agents."  Pl.'s Exh. 1 at DM 1988.

At this meeting, Mr. Cochran also questioned Plaintiff about the status of paperwork

regarding Plaintiff's home-finding trip to Chicago.  Plaintiff contends that he was not late or

dilatory in completing such paperwork since the trip was not mandatory, there was no deadline

for submitting the paperwork, and Plaintiff had made contacts about places to live in Chicago.

Pl.'s Stmt. ¶¶ 23, 24; Pl.'s Exh. 1 ¶ 61 (Desmond Decl.).

Plaintiff states that after this meeting, he "drafted a document styled as a resignation letter merely to vent his emotions, and had no intention of tendering the letter or resigning from the FBI." Pl.'s Stmt. ¶ 25. Plaintiff contends that this letter, which was kept in an envelope "out of view with the rest of his belongings," was later thrown away with the envelope. Pl.'s Stmt. ¶ 26. Defendant does not dispute this.

Plaintiff and Mr. Cochran had an interaction on August 25, 2000, regarding Plaintiff's logistical questions pertaining to his Chicago assignment. Pl.'s Stmt. ¶ 28. After this discussion, Plaintiff contends that he "prepar[ed] another draft of the resignation letter, [and] placed the letter with his belongings at his seat in the classroom, under papers, writing instruments, and a disk, such that the letter could not be seen without removing items . . . ." Pl.'s Stmt. ¶ 30.

> 5.    *Discovery of Plaintiff's "Letter of Resignation" and Request for Personnel Forms*

Defendant contends that on August 25, 2000, Plaintiff met again with Mr. Cochran who informed him that a "letter of resignation" written by Plaintiff had been found, and that FBI officials were thinking of not letting Plaintiff graduate with his class. Def.'s Stmt. ¶ 30; Def.'s Exh. 1 at 160–61 (Desmond Dep.). Mr. Cochran moved Plaintiff's personal items and located the letter. Pl.'s Resp. ¶ 30; Def.'s Exh. 1 at 164 (Desmond Dep.); Pl.'s Exh. 3 at 174–75 (Cochran Dep.). The salutation on the letter in question was "To whom it may concern/Director Freeh:" and the letter was dated August 29, 2000, graduation day for NAC 00-08. Def.'s Exh. 9. The letter included the following language with respect to the FBI: "[T]he deceit and lies I have been told, since before being hired and continuing for the last three years of my FBI employment,

12

have finally gotten to be too much.  From matters concerning my pay, to transfers, to hardships, enough has occurred to tarnish, and quite possibly ruin, my image of the FBI.  I still have a lot of admiration for the street Agents, but the supervisors and management leave a lot to be desired." Def.'s Exh. 9 ("Resignation" letter).

Plaintiff denies that the document found was a "letter of resignation," stating that he had no intention of resigning from Special Agent training; Defendant does not dispute that Plaintiff iterated that he had no intention of resigning and strongly desired to complete training during several meetings on August 25, 2000, including meetings with Matthew Corten (Mr. Cochran's Field Counselor), Mr. Cochran, and Unit Chief Roger Trott.  Pl.'s Resp. ¶ 30; Pl.'s Exh. 3 at 204 (Cochran Dep.); Pl.'s Exh. 9 at 55 (Trott Dep.); Pl.'s Exh 1 at 70–79 (Desmond Decl.) and Exh. K (Letter to Trott/Higginbotham).  At some point, Mr. Cochran had told Mr. Trott that Plaintiff was non-committal about becoming a Special Agent.  Pl.'s Stmt. ¶ 35; Pl.'s Exh. 9 at 52–53 (Trott Dep.).  Plaintiff was encouraged to resign on August 25, 2000, during a meeting with Mr. Corten, which Mr. Corten does not dispute.  Pl.'s Exh. 4 at 82–83, 96–97 (Corten Dep.); Pl.'s Resp. ¶ 30.  Mr. Trott instructed Plaintiff to "take stock" over the weekend.  Pl.'s Exh. 9 at 75 (Trott Dep.); Pl.'s Resp. ¶ 30.

Mr. Cochran also had been informed that Plaintiff had asked for an FBI Form FD–193, entitled "Report of Exit and Separation," and a Form SF–52, entitled "Request for Personnel Action," both of which are executed at the time of an FBI employee's resignation.  Def.'s Exh. 7 at 184 (Cochran Dep.); Def.'s Stmt. ¶ 32.  Plaintiff, however, denies that he intended to request resignation forms, stating that he requested the forms he believed were appropriate to request a temporary medical leave in order to assist his 82-year-old uncle after brain surgery.  Pl.'s Exh. 1

13

at 66 (Desmond Decl.); Pl.'s Resp. ¶ 32.  Plaintiff explained to Mr. Cochran and Mr. Trott that

he had believed that he requested forms pertaining to medical leave requests, and that he had no

intention of resigning.  Pl.'s Exh. 1 ¶¶ 67, 68, 74, and Ex. K at 9 (Desmond Decl.); Pl.'s Resp. ¶

32.

Also on August 25, 2000, at the meeting with Mr. Cochran and Mr. Trott, Plaintiff was

informed that his graduation status was in doubt, and that a decision would be forthcoming.

Def.'s Stmt. ¶ 33; Pl.'s Resp. ¶ 33.  At this meeting, Plaintiff stated that "he had written the

resignation letter as a way to vent emotions, that this was a technique the EAP counselor had

recommended, and that he believed that Mr. Cochran was using the fact that he had consulted

with an EAP counselor and that he had been diagnosed with PTSD, against him."  Pl.'s Stmt. ¶

44; *see also* Pl.'s Exh. 1 ¶ 76 (Desmond Decl.) (not disputed by Defendant).  Plaintiff also

specifically referenced his EAP diagnosis of PTSD to Mr. Trott.  Pl.'s Stmt. ¶ 36; Pl.'s Exh. 1 ¶

76 (Desmond Decl.) (not disputed by Defendant).  Mr. Trott briefed Section Chief John Louden

on Plaintiff's situation that day, and Mr. Louden made a preliminary determination that Plaintiff

would not graduate on August 29, 2000, and that a suitability inquiry would be conducted.  Pl.'s

Exh. 9 at 73–74 (Trott Dep.); Pl.'s Resp. ¶ 33.  To initiate the process of the suitability inquiry,

Mr. Trott instructed Mr. Cochran to begin conducting interviews to seek additional information.

Pl.'s Exh. 3 at 212–13 (Cochran Dep.).

### 6.     Additional Meeting with EAP

Mr. Trott told Plaintiff that the FBI wanted Plaintiff to speak with Dr. Nancy Davis, a

psychologist working in the FBI's EAP.  Def.'s Stmt. ¶ 36; Pl.'s Resp. ¶ 36.  Plaintiff met with

Dr. Davis on August 28, 2000, during which he relayed feelings of guilt, fear, and anxiety and

relayed having substantial difficulty sleeping, a problem that predated his training but was greatly exacerbated during his training.  Pl.'s Exh. 13 at 25–60 (Davis Dep.); Pl.'s Resp. ¶ 36.  Dr. Davis confirmed to Plaintiff that he suffered from PTSD, and that some of the behaviors he exhibited were symptoms of that condition.  Pl.'s Exh. 13 at 69, 73, 79, 110-111 (Davis Dep.), Pl.'s Resp. ¶ 36.  Dr. Davis subsequently informed Mr. Trott that Plaintiff was "having some of the PTSD," but was not suicidal.  Pl.'s Exh. 13 at 73–74 (Davis Dep.); Pl.'s Exh. 9 at 137 (Trott Dep.); Pl.'s Resp. ¶ 36.  At some point, Dr. Davis had a conversation with Assistant Director Jeffrey Higginbotham about Plaintiff's PTSD; Dr. Davis later agreed that Mr Higginbotham harbored concerns that Plaintiff "continued to suffer from some sort of psychological impairment, that would affect his abilities going forward[.]" Pl.'s Exh. 13 at 144 (Davis Dep.); Pl.'s Stmt. ¶ 61.

  D.  *Post NAC 00–08 graduation events*

  Graduation for NAC 00–08 was held on August 29, 2000.  Def.'s Stmt. ¶ 35; Pl.'s Resp. ¶ 35.  Plaintiff did not graduate with NAC 00–08.  Instead, Plaintiff reported to Mr. Trott's office on August 29, 2000, as he had been instructed the day prior, in order to answer a series of questions; however, the questions had not been completed when Plaintiff arrived, as Plaintiff was told by Mr. Trott that Mr. Trott "had assumed Plaintiff would resign and fail to show up the next day."  Pl.'s Stmt. ¶ 51; Pl.'s Exh. 1 ¶¶ 86, 89 (Desmond Decl.).  When Plaintiff responded to the written questions prepared by Academy officials the following day, he indicated that he had written the resignation letter to "vent," had no intention of resigning from the FBI, and was committed to becoming a Special Agent.  Pl.'s Exh. 1 at Exh. K (Desmond Ltr. to Trott/Higginbotham); Pl.'s Stmt. ¶ 52.

Mr. Cochran conducted a suitability inquiry of Plaintiff.[2]  Def.'s Stmt. ¶ 37; Pl.'s Resp. ¶

37.  Mr. Cochran interviewed some but not all of the classmates that Plaintiff had named as

individuals that he felt would be good to interview.  Pl.'s Exh. 3 at 251 (Cochran Dep.); Pl.'s

Resp. ¶ 37.  During these interviews, Mr. Cochran did not include or solicit information

regarding Plaintiff's commitment and ability to be a good special agent, his commitment to move

to Chicago, or any facts or explanations to rebut the allegations against him.   Pl.'s Exh. 5 at 15,

59–61, 86 (Carpenter Dep.); Pl.'s Exh. 6 at 23, 29–31, 42–43, 59–60, 65–67, 77–78 (Wulbert

Dep.) ; Pl.'s Resp. ¶ 37.  During an interview conducted by Mr. Corten with Kera Wulbert, a

classmate of Plaintiff's who was a former suicide prevention counselor, Ms. Wulbert indicated

that she did not believe Plaintiff to be a risk to himself or to the public.  Pl.'s Stmt. ¶ 49; Pl.'s

Exh. 4 at 112-13 (Corten Dep.).

        After conducting the suitability inquiry, Mr. Cochran drafted a memorandum dated

September 18, 2000, to FBI Assistant Director Jeffrey Higginbotham, who was responsible for

the overall management of the Academy's Training Division.  Def.'s Stmt. ¶ 38; Pl.'s Resp. ¶ 38.

Mr. Cochran's memorandum stated that Plaintiff "failed to appropriately exhibit the six

[suitability] dimensions as outlined in the Rules, Regulations, and Requirements document.

Def.'s Exh. 13 at DM1915 (Cochran Memo.).  Attachments to the memorandum include letters

or documentation of interviews with Plaintiff's supervisors, instructors, and classmates, many of

which question Plaintiff's intention to graduate in addition to his composure (namely, his

propensity to cry), attitude, diligence, maturity, and/or emotional stability in relation to his ankle

---

[2]  Beginning September 5, 2000, when Plaintiff returned to the Academy, he was assigned to answer
telephone calls at the Academy switchboard while the suitability investigation was ongoing.  Pl.'s Stmt. ¶ 53.

injury while a member of NAC 00-06, his attempts to obtain a transfer to the Cleveland division,

the receipt of his orders to the Chicago division, and his work on the FBI switchboard after his

non-graduation with NAC 00-08.  Def.'s Exh. 13 (Cochran Memo.) at DM 1925 (Letter from

John Wills to Cochran), DM 1966–67 (Letter from Corten to Cochran), DM 1969–70 (Letter

from Corten to Cochran), DM 1997 (Interview with SA Jeff Cugno), DM 2022–23 (Interview

with SA Wes Yoo), DM 2025 (Letter from John Zero to John Wills), DM 2027 (Interview with

SA Barbara Kelleher), DM 2029 (Interview with Larry Akin, Firearms Training Unit instructor),

DM 2037 (Interview with Field Counselor Tuan Nguyen), DM 2046 (Interview with Shannon

Pierce), DM 2048–49 (Letter from Margaret Morgan to Cochran), DM 2053–54 (Interview with

Chris Kay).  Other issues documented included Plaintiff's "letter of resignation" and written

explanation, Plaintiff improperly signing out when he left the Academy, Plaintiff wearing

improper attire, and Plaintiff's failure to report a traffic infraction that occurred on August 29,

2000.  *See* Def.'s Exh. 13 (Cochran memo. and attachments).

     In a memorandum dated September 28, 2000, Mr. Higginbotham submitted a

memorandum to the Administrative Services Division, "recommend[ing] the removal of New

Agent Trainee Martin Patrick Desmond from the position of Special Agent and his return to his

previous support position, based on NAT Desmond's lack of emotional maturity and

cooperativeness."  Def.'s Exh. 14 at 1 (Higginbotham memo.).  Mr. Higginbotham's

memorandum focused on Plaintiff's repeated attempts to dictate or later change his office

assignment and his immature behavior related to his office assignment as indicators of Plaintiff's

lack of cooperativeness and emotional maturity.  *Id.* at 1–6.  On October 3, 2000, Plaintiff met

with Mr. Cochran and Mr. Trott, who advised Plaintiff of the decision to recommend to the FBI's

Administrative Services Division that Plaintiff be dismissed from New Agents Training at the FBI Academy.  Def.'s Stmt. ¶ 40; Pl.'s Resp. ¶ 40.

Plaintiff met with Mr. Higginbotham on October 4, 2000.  Pl.'s Stmt. ¶ 66.  At that meeting, Plaintiff relayed to Mr. Higginbotham his plans to move to Chicago, the fact that the resignation letter was written after the EAP counselor had recommended writing letters as a way to vent his frustrations, and that his classmates and instructors were of the opinion that he would make a good Special Agent and were surprised that he had not graduated with his class.  Pl.'s Stmt. ¶ 66; Pl.'s Exh. 1 ¶¶ 105–07 (Desmond Decl.).  Mr. Higginbotham agreed to review Plaintiff's situation and invited Plaintiff to submit any information he deemed important to inform Mr. Higginbotham's decision.  Pl.'s Stmt. ¶ 67; Pl.'s Exh. 11 at 158 (Higginbotham Dep.).  Several members of NAC 00–08 thereafter submitted letters supporting Plaintiff.  Pl.'s Stmt. ¶ 68; Pl.'s Exh. 1 at Exh. L (Carpenter letter), Exh. M (Kay letter); Exh. N (Frensley letter); Exh. O (Shute letter); and Exh. P (Wulbert letter).

> E.     *EEOC and other legal contact*

On October 10, 2000, Plaintiff spoke with Supervisory Special Agent Thomas Colbridge, an employee in the FBI Academy Legal Unit.  Mr. Colbridge indicated to Plaintiff that PTSD qualified as a disability, but would not necessarily disqualify an individual from serving as a Special Agent.  Pl.'s Stmt. ¶ 69; Pl.'s Exh. 1 ¶ 113 (Desmond Decl.).  Mr. Colbridge refused to speak with Plaintiff any further when Plaintiff identified himself.  Pl.'s Stmt. ¶ 69; Pl.'s Exh. 1 ¶ 113.  Mr. Colbridge later contacted Mr. Higginbotham and relayed that he had conversed with Plaintiff regarding the ADA, legal disability issues, and PTSD.  Pl.'s Stmt. ¶ 69; Pl.'s Exh. 11 at 156 (Higginbotham Dep.).

On October 11, 2000, Plaintiff contacted EEO Counselor George DeShazor, who interviewed Plaintiff on October 12, 2000.  Def.'s Stmt. ¶ 41; Pl.'s Resp. ¶ 41.  On October 12, 2000, Mr. DeShazor also interviewed Mr. Higginbotham.  Def.'s Stmt. ¶ 42; Pl.'s Resp. ¶ 42.  Mr. Higginbotham had not been made aware of Plaintiff's EEO Complaint prior to October 12, 2000.  Def.'s Stmt. ¶ 43; Pl.'s Resp. ¶ 43.  On October 13, 2000, Mr. DeShazor met with Mr. Trott and Mr. Cochran.  This was the first time that Mr. Trott and Mr. Cochran learned of Plaintiff's EEO contact.  Def.'s Stmt. ¶ 44; Pl.'s Resp. ¶ 44.

On October 14, 2000, Plaintiff filed a discrimination complaint with the OEEOA, alleging that he had been discriminated against on the basis of disability.  1st Am. Compl. ¶ 49.

On October 23, 2000, Plaintiff again met with Mr. Higginbotham.  Pl.'s Stmt. ¶ 71; Pl.'s Exh. 1 ¶ 119 (Desmond Decl.).  At this meeting, Mr. Higginbotham informed Plaintiff that he had contacted Plaintiff's instructors, other Agents, and reviewed communications from Plaintiff's classmates, and that these contacts supported Plaintiff being a Special Agent.  Pl.'s Stmt. ¶ 71; Pl.'s Exh. 1 ¶ 120 (Desmond Decl.) (not disputed by Defendant).  According to Plaintiff, at this meeting, Mr. Higginbotham explicitly "informed [Plaintiff] that he would have let [Plaintiff] graduate if [Plaintiff] had not filed an EEO complaint."  Pl.'s Exh. 1 ¶ 121 (Desmond Dec.); *see also* Pl.'s Stmt. ¶ 72.  Mr. Higginbotham denies making this statement.  Def.'s Exh. 19 at 192 (Higginbotham Dep.); Def.'s Memo. at 36–37.  During this same meeting, Plaintiff contends that Mr. Higginbotham informed Plaintiff that he wanted him to submit to behavioral testing because he suffered from PTSD.  1st Am. Compl. ¶ 53.  Mr. Higginbotham, on the other hand, contends that it was Plaintiff who raised the issue of testing.  Def.'s Exh. 19 at 190 (Higginbotham Dep.).  Thus a genuine issue of material fact exists as to these two issues.

On December 8, 2000, Plaintiff amended his complaint with the OEEOA to include a retaliation claim.  1st Am. Compl. ¶ 57.

     *F.*     *Termination and Resignation of Plaintiff*

Michael Varnum, Deputy Administrator of the Administrative Services Division of the FBI, received and reviewed the entire packet from the FBI Academy related to Plaintiff, which consisted of Mr. Higginbotham's September 28, 2000 memorandum, which had attached to it Mr. Cochran's September 18, 2000 report of the suitability investigation.  Def.'s Stmt. ¶ 46; Pl.'s Resp. ¶ 46.   Mr. Varnum relied on the documentation provided to him as the basis for his decision.  Pl.'s Stmt. ¶ 74; Pl.'s Exh. 19 at 39 (Varnum Dep.).  In a letter to Plaintiff dated November 6, 2000, Mr. Varnum wrote, "This is to inform you of my decision to remove you from the FBI's New Agents' Training Program.  However, I am giving you the option of returning to your former position of Financial Analyst GS–9 in the Cleveland Division.  Should you choose not to return to that position, you are hereby dismissed from the rolls of the FBI."  Def.'s Exh. 17 at 1 (Varnum letter).  The letter detailed a number of issues regarding Plaintiff's "suitability," noting that Plaintiff's judgment was questioned when he did not report a traffic infraction as required to the Academy staff; Plaintiff's work ethic and commitment was questioned when he "performed in a lax and unreliable manner" when assigned to switchboard duty during the investigation; and Plaintiff's "repeate[d]" attempts to contact the Transfer Unit, FBI Headquarters, and the Academy staff to attempt to amend his transfer orders, his "sulk[ing]" behavior upon receiving his orders, and his "letter of resignation" all "cast doubts upon [Plaintiff's] cooperativeness and level of maturity.  Def.'s Exh. 17 at 1–2 (Varnum letter).  Varnum's letter also added, "Most important, your superiors and I are concerned about your

safety and ability to deal with difficult and potentially dangerous situations that you will confront as an Agent in the field."[3]   Def.'s Exh. 17 at 2–3 (Varnum letter).   Mr. Varnum did not have knowledge of Plaintiff's EEO complaint prior to November 8, 2000.   Def.'s Exh. 16 at 112–113 (Varnum Dep.); Def.'s Stmt. ¶ 47.[4]

By letter dated November 14, 2000, Plaintiff resigned from the FBI "for personal reasons that are beyond my control."   Def.'s Exh. 18 (Desmond Resignation); Def.'s Stmt. ¶ 50; Pl.'s Resp. ¶ 50.

Based on the above-listed events, Plaintiff alleges in his First Amended Complaint that the FBI subjected him to discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*   Plaintiff claims both that he suffers from PTSD and that Defendant was aware that Plaintiff was disabled and regarded him as disabled.   1st Am. Compl. ¶¶ 62, 64.   Plaintiff specifically alleges that Defendant discriminated against Plaintiff by criticizing his performance without justification, by subjecting him to a performance investigation without justification, by refusing to allow him to graduate from the FBI Academy despite his successful completion of course work and training, and by terminating him from the position of Special Agent.   1st Am. Compl. ¶ 68.   Plaintiff also alleges that Defendant retaliated against Plaintiff after learning that Plaintiff filed a charge of discrimination by instructing him that he would be required to undergo specialized testing, by refusing to allow him to graduate

---

[3]  Plaintiff's claims, see Pl.'s Stmt. ¶ 75, that certain Academy officials at Quantico had concerns about Plaintiff being issued a service weapon or reacting in dangerous situations will be addressed by the Court later in this memorandum.  *See infra* at 39, 41.

[4]  Plaintiff denies that Mr. Varnum had no knowledge of Plaintiff's EEO Complaint upon making the decision that Plaintiff should be removed from the position of Special Agent, but points to no evidence of any kind for this denial.  *See* Pl.'s Resp. ¶ 47.

from the FBI Academy, and by terminating him from the position of Special Agent.  1st Am.

Compl. ¶ 72.  Plaintiff requests relief in the form of an order reinstating Plaintiff to the position

of Special Agent within the FBI, a declaratory judgment that Defendant's treatment of Plaintiff

violated Section 501 of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, back pay damages, front

pay damages, compensatory damages, an award of Plaintiff's attorneys' fees and costs, and any

other relief the Court deems just.  1st Am. Compl. at p. 21.

## II: LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation

omitted).  Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by

[his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.' "  *Id.* at 324 (internal

citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be

material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41,

23

47 (D.D.C. 2003) (abrogated on other grounds) (special caution "does not eliminate the use of

summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a

'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy

and inexpensive resolution of every case."  *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex*

*Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for summary

judgment under a "heightened standard" that reflects "special caution."  *Aka v. Wash. Hosp. Ctr.*,

116 F.3d 876, 880 (D.C. Cir. 1997) (internal quotations omitted), overturned on other grounds,

156 F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more

exacting, it is not inherently preclusive.  Although more circumspect, the Court will continue to

grant a motion for summary judgment in which the nonmoving party has failed to submit

documents that create a genuine factual dispute and the moving party is entitled to a judgment as

a matter of law.

### III:  DISCUSSION

*A.      Discrimination Claims*

Defendant seeks summary judgment on Plaintiff's discrimination claims.  As noted at the

outset, Plaintiff brings this action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et*

*seq.*, which allows qualified disabled federal employees to sue their employers when they have

been subjected to discrimination.  Pursuant to 29 U.S.C. § 794(a), "No otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance or under any program or

activity conducted by any Executive agency or by the United States Postal Service."  It is

uncontested that Plaintiff was an employee during the relevant time period and that Defendant is an employer within the meaning of the Rehabilitation Act.  The Court exercises jurisdiction over Plaintiff's claim according to 28 U.S.C. § 1331.

The standards for determining an employment-related violation of the Rehabilitation Act are the same standards used for a similar violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12111 *et seq*.  28 U.S.C. § 794(d).  *See also* 29 C.F.R. § 1614.203(b) ("The standards used to determine whether section 501 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 791), has been violated in a complaint alleging nonaffirmative action employment discrimination under this part shall be the standards applied under Titles I and V (sections 501 through 504 and 510) of the Americans with Disabilities Act of 1990, as amended (42 U.S.C. 12101, 12111, 12201), as such sections relate to employment.  These standards are set forth in the Commission's ADA regulations at 29 CFR part 1630.").

The D.C. Circuit applies the *McDonnell Douglas* tripartite burden-shifting framework to Rehabilitation Act discrimination cases where, as here, the plaintiff "offers no direct evidence tending to show discriminatory animus and the defendant denies that its decisions were motivated by the plaintiff's disability." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997).  *See Duncan v. WMATA*, 240 F.3d 1110, 1115 (D.C. Cir. 2001); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993).  *See also McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. 411 U.S. at 802. In order to make a *prima facie* case under the Rehabilitation Act, Plaintiff must show that he (1) is a disabled person within the meaning of the Act; (2) is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) suffered an adverse employment decision because of his disability. *Swanks v. WMATA*, 179 F.3d 929, 934 (D.C. Cir. 1999); *Dorchy v. WMATA*, 45 F. Supp. 2d 5, 10 (D.D.C. 1999).

If Plaintiff succeeds in establishing a *prima facie* case, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for the adverse action against Plaintiff, and to produce credible evidence supporting Defendant's claim. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "[a]lthough the *McDonnell Douglas* framework shifts 'intermediate evidentiary burdens' between the parties, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (citations omitted), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

If Defendant is successful, then "the *McDonnell Douglas* framework–with its presumptions and burdens–disappear[s], and the sole remaining issue [is] discrimination *vel*

*non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 517 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight."). Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10).

At this stage, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*,

156 F.3d at 1290.  The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer."  *Holcomb v. Powell*, 2006 WL 45853 (D.C Cir. 2006) (citing *Aka*, 156 F.3d at 1289).

> 1.    *Plaintiff does not meet the definition of "disabled" necessary to make a prima facie case of discrimination under the first prong of the* McDonnell Douglas *test.*

As iterated above, in order to make a prima facie case for discrimination under the Rehabilitation Act where there is no direct evidence of discrimination, Plaintiff must show that he is (1) a disabled person within the meaning of the Act; (2) qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) suffered an adverse employment decision because of his disability.  *Swanks*, 179 F.3d at 934; *Dorchy*, 45 F. Supp. 2d at 10.  Since Defendant does not contest that Plaintiff is qualified to perform the functions of the position of FBI Special Agent with or without reasonable accommodation, nor does Defendant contest that Plaintiff suffered from an adverse employment decision, the issues that Plaintiff must prove are that 1) Plaintiff is disabled within the meaning of the Rehabilitation Act, and if his status as disabled is proven, 2) that Defendant's adverse employment actions against Plaintiff were "because of" his disability.

For an individual to qualify as "disabled" within the meaning of the Rehabilitation Act, he must meet the standards set forth in the 42 U.S.C. § 12102(2) of the ADA.  Disability is defined as follows: "(A) a physical or mental impairment that substantially limits one or more of

the major life activities of such individual; (B) a record of such an impairment; or (c) being

regarded as having such an impairment."  42 U.S.C. § 12102(2).

<em>a.      Plaintiff was not disabled when employed by the FBI.</em>

Plaintiff argues that he is disabled within the meaning of the Rehabilitation Act because

he has a mental impairment which substantially limits one of his major life activities, thus

meeting the criteria set forth in 42 U.S.C. § 12102(2)(A).  Specifically, Plaintiff argues that his

PTSD substantially limits his ability to sleep.  Pl.'s Opp'n at 33.  Defendant, on the other hand,

contends that even if sleeping is considered a "major life activity," which is unclear in the D.C.

Circuit, Plaintiff's ability to sleep is not substantially limited such that he can be considered

"disabled" under the Rehabilitation Act.  Def.'s Memo. at 25–27.

As an initial matter, a number of federal courts have held that PTSD can be a mental

impairment under the Rehabilitation Act.  *See Sherback v. Wright Auto. Group,* 987 F. Supp.

433, 436 (W.D. Pa. 1997) (PTSD "is a psychiatric impairment which may qualify for disability

status under the ADA if the impairment substantially limits a person's major life activities or is

regarded by the employer as doing so.").  *See also Rohan v. Networks Presentations LLC*, 375

F.3d 266, 273–74 (4th Cir. 2004); *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166 (1st Cir.

1998); *Coaker v. Home Nursing Services, Inc.*, 1996 WL 316739 at *12 (S.D. Ala.).  *But see*

*Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998) ("[Plaintiff]

claims to suffer from PTSD, which impairment, standing alone, is not necessarily a disability

contemplated by the ADA.  The statute requires an impairment that substantially limits one or

more of the major life activities."); *Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1350 (S.D.

Fla. 2001), *aff'd by Johnston v. U.S. Postmaster Gen.*, 277 F.3d 1380 (11th Cir. 2001).  It should

29

be noted that 42 U.S.C. § 12102(2) defines an individual as disabled not by listing a specific set of diagnosable medical conditions but instead by measuring the impact of a physical or mental "impairment" on an individual's ability to participate in major life activities.

In assessing whether sleeping can be considered a "major life activity," the Court first turns to the definition of "major life activity" provided by 29 C.F.R. § 1630.2(i), which according to 29 C.F.R. § 1614.203(b) is one of the standards used to determine a violation of the Rehabilitation Act.[5]  A "major life activity" is defined as a "functio[n] such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  Since the wording "such as" indicates that this listing of major life activities is not exhaustive, *see Bragdon v. Abbott*, 524 U.S. 624, 639 (1998), the Court must separately analyze whether sleeping is in fact a major life activity.

As an initial point of analysis, it should be noted that not only does sleeping comprise a substantial percentage of the average person's day, it is also necessary for survival.  With the indispensable nature of sleep in mind, this Court adopts the view held in this district that sleeping is a major life activity, despite the lack of precedential authority in this Circuit on point.  *See Haynes v. Williams*, 279 F. Supp. 2d 1, 8–9 (D.D.C. 2003).  Also, in *Haynes v. Williams*, the D.C. Circuit noted without making a ruling that a number of other circuits have found sleeping to be a "major life activity" under the ADA.  *Haynes v. Williams*, 392 F.3d 478, 482 n.3 (D.C. Cir. 2004) (citing *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352–53 (4th Cir. 2001); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999)).

---

[5]  *See supra* at 25.

Assuming that sleeping is a major life activity, the Court will next assess whether Plaintiff's ability to sleep has been substantially limited.  Plaintiff claims that before receiving orders while at the Academy, Plaintiff slept an average of three to five hours a night, but that after receiving orders, Plaintiff began to sleep only two to four hours each night.  Plaintiff also claims that he was unable to sleep more than four hours a night until he returned to Ohio permanently.  Pl.'s Exh. 1 ¶ 48 (Desmond Decl.); *see also* Pl.'s Stmt. ¶¶ 108–09.  At issue in this motion for summary judgment is whether the duration and frequency of Plaintiff's sleep constitute a substantial limitation on the activity of sleeping.

Pursuant to 29 C.F.R. § 1630.2(j), "substantially limits" is defined as follows: "(1) The term substantially limits means: (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  Because Plaintiff does not claim to be completely unable to sleep, the Court must determine if Plaintiff is "significantly restricted" in his ability to sleep.

While no explicit definition of "significantly restricted" is provided by the regulation, 29 C.F.R. § 1630.2(j)(2) lists a number of non-exclusive factors that a court should consider "in determining whether an individual is substantially limited in a major life activity," including "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  After examining these factors as well as case law

31

from this and other jurisdictions, the Court agrees with Defendant that Plaintiff is not substantially limited in the activity of sleeping.

The amount of sleep obtained by Plaintiff changed over the course of his time at the FBI Academy, from three to five hours a night decreasing to two to four hours a night after he received his orders to go to Chicago.  Pl.'s Exh. 1 ¶ 48 (Desmond Decl.); *see also* Pl.'s Stmt. ¶¶ 108–09.  Using the minimum sleep range achieved by Plaintiff–two to four hours per night–as a guide, this Court, unable to find guidance on this issue in this Circuit, looks to case law from other federal courts in making its determination that achieving two to four hours of sleep per night, even without considering the limited time period during which Plaintiff only achieved this baseline of sleep per evening, does not on its face necessarily qualify as a substantial limitation on the ability to sleep as required by the Rehabilitation Act.  *See Boerst v. General Mills Operations, Inc.*, 2002 WL 59637 *4 (6th Cir.) ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA."), *cited by Haynes v. Williams*, 279 F. Supp. 2d 1, 11 (D.D.C. 2003); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (evidence of episodes of sleep disruption and/or waking without feeling rested experienced over a six-month period, including getting only two to three hours of sleep per night, did not indicate that sleep problems were severe, long term, or had a permanent impact).

Plaintiff cited a number of cases to allegedly demonstrate that other courts have found that two to four hours of sleep a night constitutes a substantial limitation on the major life activity of sleeping.  However, as indicated by Defendant, "none of the cases cited by plaintiff concern an alleged disability based on lack of sleep that apparently lasted only a few months and

then resolved itself when the person changed locations."  Def.'s Reply at 4.  In *McAlindin v. County of San Diego*, the Ninth Circuit held that an individual providing evidence of experiencing great difficulty sleeping at night over a number of years (rather than merely five months) had raised an issue of material fact such to survive summary judgment regarding the impact of his mental impairments on the Ninth-Circuit recognized major life activity of sleeping. *McAlindin v. County of San Diego*, 192 F.3d 1226, 1231–32, 1235 (9th Cir. 1999).  All but one of the other cases cited by Plaintiff are similarly distinguishable on the basis of the length of time over which ability to sleep was affected or the actual amount of sleep achieved on a nightly basis (or some combination thereof).  *See Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640, 646, 654 (S.D.N.Y. 2001) (medical progress reports over the course of eight months, including report indicating that plaintiff could only sleep between one and two hours per night, demonstrate substantial limitation sleeping); *Presta v. S.E.P.T.A.,* 1998 WL 310735 at *7 (E.D. Pa.) (substantial limitation sleeping demonstrated by variable ability to sleep, ranging from less than four to five hours of sleep per night to between two and three hours of sleep per night, over a number of years).  *But see Bennett v. Unisys Corp.*, 2000 WL 33126583 at *6–7 (E.D. Pa.) ("A jury may well find that [Plaintiff's] sleep difficulties [between four and six hours of sleep per night documented over the course of three months after receiving medication] amounted to nothing more than those experienced by the majority of people.  However, this is a factual issue and [Plaintiff] has produced sufficient evidence to preclude summary judgment.")

Also, it is important to note that Plaintiff admits to being able to sleep over four hours a night after he returned to Ohio, and that even prior to receiving orders, Plaintiff "had experienced greater difficulty sleeping than [Plaintiff] did when at home in Ohio."  Pl.'s Exh. 1 ¶ 48

(Desmond Decl.); *see also* Pl.'s Stmt. ¶¶ 108–09.  This suggests that Plaintiff's ability to sleep was variable; such variability speaks to an analysis of the "permanent or long term impact" of Plaintiff's PTSD on his ability to sleep.  Because Plaintiff's ability to sleep improved upon his return to Ohio, his inability to sleep for more than two to four hours a night would be categorized as a temporary condition in addition to not being of a nightly duration severely short enough to qualify as a substantial limitation.  "It is well established that the Act was never intended to extend to persons suffering from temporary conditions or injuries."  *Paegle v. Dep't of the Interior*, 813 F. Supp. 61, 64 (D.D.C. 1993), *aff'd without opinion*, 24 F.3d 1464 (D.C. Cir. 1994).  Also, Plaintiff makes plain that his ability to sleep decreased first when his place of employment changed from Cleveland, Ohio, to Quantico, Virginia upon resuming training at the FBI Academy and decreased again when he was informed in June 2000 that his place of work would ultimately be changed to Chicago.  According to the D.C. Circuit, "[i]f the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term."  *Haynes*, 392 F.3d at 483.  In this case, any claimed severity of the impact of Plaintiff's PTSD on his ability to sleep was eliminated when Plaintiff discontinued working in Quantico (where after receiving orders he had anticipated working in Chicago) and instead pursued an alternate career in Ohio.

Finally, Plaintiff cites to an EEOC enforcement guideline for the premise that " 'an individual who for several months typically slept about two to three hours per night' would be substantially limited in the major life activity of sleeping.  Pl.'s Opp'n at 34 (quoting *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* (www.eeoc.gov/policy/docs/psych.html) ¶ 11).  However, Plaintiff is overly selective in his

34

citation.  In context, it reads as follows:

> An impairment substantially limits an individual's ability to sleep if, due to the impairment, his/her sleep is significantly restricted as compared to the average person in the general population.  These limitations must be long-term or potentially long-term as opposed to temporary to justify a finding of ADA disability.
>
> For example, an individual who sleeps only a *negligible* amount without medication for many months, due to *post-traumatic stress disorder*, would be significantly restricted as compared to the average person in the general population and therefore would be substantially limited in sleeping.  Similarly, an individual who for several months typically slept about two to three hours per night without medication, due to depression, also would be substantially limited in sleeping.

*Id.* (citation omitted and emphasis added).  Thus, the EEOC enforcement guidance specifically states that a person with PTSD who sleeps only a "negligible" amount for "many" months would be substantially limited in sleeping.  Since Plaintiff received his orders on June 15, 2000 and returned to Ohio after his resignation on November 14, 2000, it is unlikely that these five months, the purported duration of his sleeping for only two to four hours a night, would be considered "many" months.  More importantly, in using the term "negligible" in describing the amount of sleep obtained by a person with PTSD to qualify as substantially limited in sleeping and using the phrase "two to three hours per night" in describing the amount of sleep attributed to a person due to depression to be considered substantially limited in sleeping, the term "negligible" is clearly meant to indicate an amount of sleep less than two to three hours per night.

Thus, because Plaintiff cannot demonstrate that his PTSD substantially limits his ability to sleep, he does not have a disability as defined by the Rehabilitation Act.[6]

---

[6]  While the effect of Plaintiff's ability to sleep on Plaintiff's ability to perform his job would not be part of the Court's analysis of whether Plaintiff is disabled under the Rehabilitation Act, the Court regardless notes that Plaintiff's ability to sleep did not appear to affect his training record at the FBI Academy nor did Plaintiff perceive his own performance to be anything other than at a high level.  *See* Def.'s Exh. 13 at DM 1914–15; Def.'s Exh. 1 at 298-99 (Desmond Dep.).

b.       *Plaintiff was not regarded as disabled when employed by the FBI.*

As indicated above, in addition to or in lieu of demonstrating that plaintiff is actually

disabled as defined by the Rehabilitation Act, a plaintiff can meet the "disability" requirement

necessary to make a *prima facie* case of discrimination by showing that Plaintiff was "regarded

as" disabled.  A plaintiff is also considered to have a disability under the ADA and the

Rehabilitation Act if he is regarded as having a physical or mental impairment that substantially

limits him in one or more major life activities.  42 U.S.C. § 12102(2);  *Sutton v. United Air*

*Lines, Inc.*, 527 U.S. 471, 489 (1999).  In *Sutton v. United Air Lines*, the Supreme Court

established that an individual may be "regarded as" disabled when, "a covered entity mistakenly

believes that an actual, nonlimiting impairment substantially limits one or more major life

activities."  *Sutton*, 527 U.S. at 489.  *See also Murphy v. UPS, Inc.*, 527 U.S. 516, 521–522

(1999).

Plaintiff argues that he was "regarded as" disabled by the FBI in that the FBI mistakenly

perceived Plaintiff's mental impairment of PTSD to both substantially limit him in the major life

activity of working and the major life activity of interacting with others.  Pl.'s Opp'n at 25, 31.

The Court will address these claims in turn.

i.       *The FBI did not regard Plaintiff as substantially limited in*
*the major life activity of working*

Working is presently assumed by the Court to be a major life activity.  29 C.F.R. §

1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working."); *Battle v. Mineta*,

387 F. Supp. 2d 4, 9 (D.D.C. 2005).  *See also Sutton*, 527 U.S. at 492 (assuming without

36

deciding that working is a major life activity); *Duncan v. WMATA*, 240 F.3d 1110, 1114–15 n.1

(D.C. Cir. 2001) (same).  Guidance is provided by 29 C.F.R. § 1630.2(j)(3) with respect to

determining what constitutes a substantial limitation on an individual's ability to work: "With

respect to the major life activity of working–(i) The term substantially limits means significantly

restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes

as compared to the average person having comparable training, skills and abilities.  The inability

to perform a single, individual job does not constitute a substantial limitation in the major life

activity of working."  *Id.  See also Sutton*, 527 U.S. at 491 ("When the major life activity under

consideration is that of working, the statutory phrase 'substantially limits' requires, at a

minimum, that plaintiffs allege they are unable to work in a broad class of jobs."); *Duncan*, 240

F.3d at 1115.

        Pursuant to 29 C.F.R. § 1630.2(j)(3)(ii), the regulation further indicates that a "class of

jobs" is one of the factors a court may consider when determining if an individual is substantially

limited in working, describing a "class of jobs" as:

>       The job from which the individual has been disqualified because of an
>       impairment, and the number and types of jobs utilizing similar training, knowledge, skills
>       or abilities, within that geographical area, from which the individual is also disqualified
>       because of the impairment . . . .

29 C.F.R. § 1630.2(j)(3)(ii)(B).  The regulation also further indicates that a "broad range of jobs

in various classes" is one of the factors a court may consider when determining if an individual is

substantially limited in working, describing a "broad range of jobs in various classes" as:

>       The job from which the individual has been disqualified because of an
>       impairment, and the number and types of other jobs not utilizing similar training,
>       knowledge, skills or abilities, within that geographical area, from which the individual is

also disqualified because of the impairment . . . .

29 C.F.R. § 1630.2(j)(3)(ii)(C).  A court may also consider the geographical area to which the

individual has reasonable access.  29 C.F.R. § 1630.2(j)(3)(ii)(A).

Plaintiff argues in his Opposition that Academy officials determined that his mental

impairment precluded him from working "from the broad class of law enforcement jobs."  Pl.'s

Opp'n at 26.  The Court shall first consider whether "law enforcement" is either considered a

class or broad range of jobs, and if so, both what constitutes the class or range of jobs

encompassing "law enforcement" as well as what evidence, if any, Plaintiff provides to

demonstrate that the FBI determined that Plaintiff was precluded not simply from working as an

FBI agent, but from working in law enforcement entirely.

Courts, including the D.C. Circuit in a non-discrimination context, have concluded that

law enforcement constitutes a class rather than a broad range of jobs.  *See Williams v.*

*Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 764 (3d Cir. 2004); *McKenzie v. Dovala*,

242 F.3d 967, 971 (10th Cir. 2001); *Nat'l Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935,

937 (D.C. Cir. 1987) (non-discrimination case context).  Courts differ, however, as to what

constitutes "law enforcement" as a class of jobs.  The Court is mindful of the Supreme Court's

statement in *Sutton,* that "[w]hen the major life activity under consideration is that of working,

the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are

unable to work in a *broad* class of jobs."  *Sutton*, 527 U.S. at 491 (emphasis added).  In

*Giordano v. City of New York*, the Second Circuit held that the record did not show that

defendants perceived plaintiff, a terminated NYPD police officer taking anticoagulants, to be

38

unable to work in a broad class of jobs using the following analysis:

> [Plaintiff] introduced evidence that establishes at most that the defendants regarded him as disabled from police or other investigative or security jobs that involve a substantial risk of physical confrontation. The record contains no evidence from which we can infer that the defendants thought, or had grounds for thinking, that other jobs in the public or private sector–such as, for example, a job as a security guard or a private investigator, or with a police department that does not require every officer to be capable of patrol duty–carry the same nature or degree of risk.

*Giordano v. City of New York*, 274 F.3d 740, 749 (2d Cir. 2001).  This suggests that the Second Circuit perceived the class of jobs encompassing the individual position of NYPD police officer to include investigative and security jobs in which an individual would not necessarily carry a deadly weapon.  *See also McKenzie v. Dovala*, 242 F.3d 967, 971 (10th Cir. 2001)*.  But see Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751 (3d Cir. 2004) (holding that Plaintiff's medical diagnosis that he should not carry a weapon as well as the perception by his employer that he both could not carry a weapon or be around individuals carrying weapons significant limited his ability to work in the field of law enforcement).  Relying on the "broad class of jobs" phrasing in *Sutton*, the Court shall assume that law enforcement as a class of jobs is not limited to jobs in which an individual carries a firearm.

Assuming that law enforcement is a class of jobs, Plaintiff fails to demonstrate that Defendant viewed his PTSD as substantially limiting Plaintiff's ability to work in law enforcement for a number of reasons.  First, the FBI did not terminate Plaintiff entirely from the FBI; rather, Academy officials offered Plaintiff his former position within the FBI.  Plaintiff cites *Williams* for the proposition that "an inability to have access to or be around others carrying firearms would prevent [plaintiff] from serving in virtually all law enforcement positions."  *See*

Pl.'s Opp'n at 29; *Williams*, 380 F.3d at 767.  If Plaintiff had chosen to return to his former position in the FBI Division in Cleveland, Ohio, as a Financial Analyst, Plaintiff would undoubtedly have been around others carrying firearms on a routine basis.  If Defendant truly harbored continuing concerns that Plaintiff was either suicidal or homicidal, as Plaintiff claims, the Court is hard pressed to understand why the FBI would agree to continue to employ Plaintiff in any capacity considering the nature of the work conducted by the FBI.

Secondly, Plaintiff does not provide any evidence that the FBI's reservations regarding Plaintiff's emotional stability and commitment to the FBI stemmed from the FBI's misperceptions about the impact of Plaintiff's PTSD rather than Plaintiff's own missteps while at the Academy.  Plaintiff claims that aside from relaying his PTSD diagnosis to Mr. Cochran, "[n]o other intervening event existed between the time he was told by his superiors that he was performing satisfactorily and the time those same officials determined that he was unfit to serve as a Special Agent or in the field of law enforcement."  Pl.'s Opp'n at 26–27.  Plaintiff apparently ignores the fact that FBI officials found Plaintiff's "letter of resignation" and learned that he had obtained personnel forms used when an employee of the FBI retires before calling him into various meetings on the day that these findings were made to discuss Plaintiff's graduation status and the initiation of a suitability inquiry.  Moreover, Plaintiff was first called into Mr. Cochran's office on June 20, 2000, to discuss Plaintiff's perceived change in demeanor, which was nearly two months prior to the August 14, 2000 meeting during which Plaintiff relayed to Mr. Cochran that he had been diagnosed with PTSD.  *See supra* at 8, 10.

Finally, Plaintiff provides no evidence that the FBI considered Plaintiff to be unsuitable for any position other than FBI Special Agent, which is a specific position rather than a class or

broad range of jobs.  "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 523 (1999).  *See also Sutton*, 527 U.S. at 492 ("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.  If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.").  Plaintiff simply does not provide evidence that Plaintiff was viewed as unsuitable for any position other than that of FBI Special Agent.  The suitability criteria that Plaintiff did not fulfill–emotional maturity and cooperativeness–were specific criteria applied to an FBI agent's probationary period.  That Mr. Corten, Plaintiff's field agent who was not directly involved in the decision to terminate Plaintiff from the specific position of Special Agent, harbored concerns about Plaintiff being mature enough to carry a service weapon is of little significance to our analysis.   Mr. Corten did not make any allegations or through any evidence harbor the perception that Plaintiff should not carry a gun because his PTSD substantially limited him in any way.  Mr. Corten also did not have any decision-making authority in the adverse actions taken against Plaintiff.  Finally, as stated above, the class of jobs encompassing law enforcement has been held by a number of courts to be inclusive of jobs that do no require an individual to carry a weapon.  *See McKenzie,* 242 F.3d at 971–72 ("[Defendant's] refusal to consider employing [plaintiff] in a less sensitive post within the Office, such as in the civil division responsible for serving papers and subpoenas, the records division, the administrative division, or the jail division, suggests that [defendant] regarded [plaintiff] as substantially limited in her ability to work in an entire class of jobs, not merely in

the particular job of patrol officer.").

> ii.  *The FBI did not regard Plaintiff as substantially limited in the major life activity of interacting with others.*

Plaintiff also maintains that the FBI perceived his PTSD to substantially limit Plaintiff in the major life activity of interacting with others.  Pl.'s Opp'n at 31.  The Court will first examine if "interacting with others" is considered a major life activity, and if so, if the FBI indeed perceived Plaintiff's PTSD to substantially limit Plaintiff in this manner.

Since 29 U.S.C. § 1630.2(i) is silent as to whether interacting with others should be considered a major life activity, the case law reveals that a number of circuits have explicitly held that interacting with others is a major life activity.  *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 202 (2d Cir. 2004); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999); *Criado v. IBM Corp.*, 145 F.3d 437, 442 (1st Cir. 1998).  While the D.C. Circuit has not yet decided this issue, a recent case from this district agreed that interacting with others should be considered a major life activity meeting the criteria of the Rehabilitation Act and the ADA.  *See Bell v. Gonzales*, 2005 WL 691865 at *6 (D.D.C.) (agreeing with other circuits that interacting with others is a major life activity because of its "central importance to daily life" (quoting *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 197 (2002)).

However, the term "interacting with others" begs further elaboration, or in particular, what constitutes a substantial limitation interacting with others requires further guidance, as "interacting with others" is in itself a more subjective concept than hearing or seeing as it is subject to a wide indicia of indicators.  In *Bell*, the court recognized the need for an "objective

42

and strict" test for what constitutes a substantial limitation of the major life activity of interacting with others in order to meet the demanding standard for the definition of disability deemed necessary by the Supreme Court in *Toyota*. Thus, in *Bell*, lacking guidance from the D.C. Circuit, the district court adopted the standard set forth by the Second Circuit in *DiMarzio*, which reads as follows:

> [A] plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., *to initiate contact with other people and respond to them, or to go among other people–at the most basic level of these activities.* The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

*Bell*, 2005 WL 691865 at *7 (quoting *DiMarzio.*, 386 F.3d at 203 (emphasis added)).

The Court cannot find any supportable evidence that the FBI considered Plaintiff to be unable to initiate contact with others, to respond to others, or to "go among" other people such that Defendant considered Plaintiff's PTSD to substantially limit him in interacting with others.

Plaintiff claims that the FBI's perception of Plaintiff as "homicidal," "seriously withdrawn, isolated from his classmates, depressed, despondent, non-responsive, and lacking enthusiasm," "rude," "hostile," and "overly emotional," demonstrates that a genuine issue of material fact exists as to whether the FBI perceived Plaintiff to be suffering from a mental impairment that substantially limited his ability to interact with others. Pl.'s Opp'n at 32–33.

Plaintiff cites to various depositions as evidentiary bases for his claim that FBI officials perceived him to be homicidal. Pl.'s Opp'n at 33; Pl.'s Exh. 1 at 80 (Desmond Decl.); Pl.'s Exh.

9 at 134–35 (Trott Dep.); Pl.'s Exh. 13 at 61, 142 (Davis Dep.); Pl.'s Exh. 4 at 54–55, 112–113

(Corten Dep.); Pl.'s Exh. 21 at 63 (Harp Dep.).   The Court acknowledges that the perception of

an individual as homicidal would amount to a perception that an individual is substantially

limited in his ability to interact with others.   However, the Court agrees with Defendant that

Plaintiff misstates the evidence in supporting a claim that FBI officials believed Plaintiff to be

"homicidal."   *See* Def.'s Reply at 15.   While Plaintiff's declaration states that he was told by Mr.

Trott that "the administrators of the NATU were concerned that [Plaintiff] was depressed,

suicidal, or homicidal," Pl.'s Resp. ¶ 36, double hearsay evidence such as this without any named

speaker will not be considered by the Court because it does not meet the requirement set forth in

Federal Rule of Civil Procedure 56(e) that "[s]upporting or opposing affidavits . . . shall set forth

such facts as would be admissible in evidence . . . ."   *See Corley v. Life & Cas. Ins. Co. of*

*Tennessee*, 296 F.2d 449, 450 (D.C. Cir. 1961); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*,

224 F.R.D. 261, 265 (D.D.C. 2004).   Mr. Trott was asked directly during his deposition if he

believed Plaintiff to be homicidal or suicidal, or if Mr. Trott thought that the issue was whether

Plaintiff was thinking clearly, to which Mr. Trott responded: "More or less, is he thinking clearly

in the sense that when you think clearly, you wouldn't do any harm to yourself.   That's all."   Pl.'s

Exh. 9 at 136–137 (Trott Dep.).   This statement does not suggest that Mr. Trott believed Plaintiff

to be homicidal.   During Dr. Davis's deposition, she stated that she had probably indicated to

Plaintiff during her August 28, 2000 meeting with him that she had *ruled out* that he was

homicidal or suicidal.   Pl.'s Exh. 13 at 61 (Davis Dep.).   The depositions of Mr. Corten and Mr.

Harp likewise give no indication that Plaintiff was considered to be homicidal; rather they reveal

concerns these individuals harbored about Plaintiff being mature enough to carry a service

weapon.  The leap between being immature and homicidal is clearly not supported by their statements.

Likewise, none of the other concerns raised in depositions cited by Plaintiff suggest that FBI officials believed that Plaintiff was unable to initiate contact with, respond to, or go among others.  *See* Pl.'s Exh. 1 ¶ 73 (Desmond Decl.), Exh. 14; Pl.'s Exh. 9 at 14, 29, 122–23 (Trott Dep. ) (describing Plaintiff as "melancholy" about his transfer, "less enthusiastic" than the normal trainee, and "kind of brooding"); Pl.'s Exh. 4 at 54–55, 59–61, 67, 74, 79–80 (Corten Dep.) (observed Plaintiff to be crying and then shortly thereafter angry on August 25, 2000; generally characterized Plaintiff as withdrawn and "not enthusiastic," despite performing well in tasks); Pl.'s Exh. 11 at 50 (Higginbotham Dep.) (indicating that classmates referred to Plaintiff as a "sad sack"); Pl.'s Exh. 2 at 93 (Jacobs Dep.) ("I remember someone telling me that [Plaintiff] had seemed, you know, very down, during the training, and kind of kept to himself, and just seemed to be kind of in a depressed state"); Pl.'s Exh. 16 at 5 (Higginbotham memo.) ("[Plaintiff's] behavior surrounding [his transfer] was emotional, petulant, sulking, pouting, and immature. [Plaintiff] was not emotionally stable and chose to separate himself from the social environment and support of his class").  The statements in these exhibits simply do not support a perception held by FBI officials that Plaintiff demonstrated an inability to interact with others to a degree even close to what would be necessary to constitute a substantial limitation.  Also, these statements focus on Plaintiff's interactions with classmates and officials, not instructors or his family, over a finite period of time and related to a particular event, which is simply not consistent with a widespread inability to interact with others.  *See Steele v. Thiokol Corp.*, 241 F.3d 1248, 1255 (10th Cir. 2001); *McAlindin*, 192 F.3d at 1235 ("Mere trouble getting along with

coworkers is not sufficient to show a substantial limitation").

    **2.**    *Even if Plaintiff were found to be disabled or regarded as disabled,*
        *Plaintiff was not terminated on this basis.*

The Court holds that Plaintiff was not disabled, nor was he regarded as disabled by the FBI as defined by the Rehabilitation Act. However, even if Plaintiff were found to be either disabled and/or regarded as disabled by the FBI, Plaintiff still cannot show that Defendant's articulated reasons for terminating Plaintiff were pretextual.

Defendant fulfills the second prong of the *McDonnell Douglas* balancing framework by producing legitimate, non-discriminatory reasons for Plaintiff's non-selection and producing credible evidence to support Defendant's claim. *See McDonnell Douglas*, 411 U.S. at 802. A defendant must articulate legitimate, non-discriminatory reasons with "sufficient clarity" to allow plaintiff to show that such reasons are pretextual. *Burdine*, 450 U.S. at 255–56. Defendant argues that the admittedly adverse employment decisions made against Plaintiff were based on Plaintiff's failure to exhibit during his probationary period the level of emotional maturity and cooperativeness, two Agent "suitability criteria," necessary to become an FBI Agent, as evidenced by his unwillingness to accept his orders to report to the FBI Division in Chicago upon graduation. Def.'s Memo. at 33–34.

Plaintiff in his Opposition has chosen to respond by alleging that Defendant's proffered legitimate, non-discriminatory reasons are pretextual. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143. However, "[a]t this stage, if [plaintiff] is unable to adduce

46

evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered

reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]."

*Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

Plaintiff fails to directly persuade the Court that Defendant was motivated by

discrimination related to Plaintiff's PTSD.  Plaintiff alleges that Defendant did not criticize

Plaintiff for his various requests to transfer to the Cleveland division until after he informed

"academy officials" about his PTSD.  Pl.'s Opp'n at 38.  Plaintiff argues that the "baseless

conclusion that [Plaintiff] was suicidal, homicidal, a threat to himself or others, unfit to carry a

firearm, and emotionally unstable" on the part of FBI officials both prompted adverse actions

against Plaintiff and are evidenced by "discriminatory statements and attitudes on the part of

Academy officials."  *See* Pl.'s Opp'n at 40.

However, as discussed in Section III(A)(2)(b), Plaintiff does not provide credible

evidence that FBI officials perceived Plaintiff to be suicidal, homicidal, or a threat to himself or

others.  *See supra* § III(A)(2)(b).  Nor does Plaintiff provide any direct evidence linking FBI

officials' perceptions of Plaintiff's behavior and/or action with his diagnosis of PTSD rather than

simply to Plaintiff's level of emotional maturity.

Plaintiff also fails to demonstrate that the FBI's stated reasons for adverse actions against

him are "unworthy of credence."  Despite Plaintiff's assertions to the contrary, the Court finds it

reasonable to believe that Plaintiff's numerous transfer requests are worthy of credence as one of

a number of reasons for the adverse employment actions against him.  *See* Pl.'s Opp'n at 37–38.

Regardless of Plaintiff's iterated explanations regarding his "letter of resignation," the Court

47

gives full credence to Defendant's concerns regarding Plaintiff's judgment in addition to

concerns regarding his commitment to the FBI Special Agent program based on the placement of

this letter.  Indeed, the Court is hard pressed to see how Plaintiff's creating in the Academy or

bringing such a document (psychological exercise or not)–a document including disparaging

words about the FBI, a document dated for graduation day, a document including words of

resignation commencing with a salutary byline to the Director of the FBI–to a shared classroom

at the FBI Academy training facility can be viewed as anything other than an enormous lapse in

judgment on the part of Plaintiff.  This, coupled with Plaintiff's same-day request for documents

used when an FBI Agent resigns, regardless of Plaintiff's purported intentions behind his request

for forms, would legitimately provide more than ample cause for concern on the part of

Defendant as to Plaintiff's commitment to the FBI Special Agent program.

Finally, Plaintiff claims that the "number of shifting and alternating explanations offered

by the FBI for [Plaintiff's] dismissal" is further evidence of pretext.  Pl.'s Opp'n at 39.  The cases

cited by Plaintiff do stand for the proposition that when an employer offers changing and

contradictory explanations for an adverse action, such changing justifications may be probative

of pretext.  *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001) ("[T]he

fact that [Defendant] has offered different justifications at different times for its failure to hire

[Plaintiff ] is, in and of itself, probative of pretext."); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202

F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and

arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.");

*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's

changing rationale for making an adverse employment decision can be evidence of pretext.");

*Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (inconsistent explanations).

However, in this case, neither Defendant's rationale nor the actual reasons behind Defendant's adverse employment actions against Plaintiff actually changed, they simply further developed over the course of the investigation.  Defendant's reasons for terminating Plaintiff as stated in Mr. Varnum's letter, while stemming from the core issue of Plaintiff's reaction to his orders to move to Chicago, are more voluminous than the concerns prompting the initial stay of Plaintiff's graduation date and the initiation of a suitability inquiry for two obvious reasons. First, concerns regarding Plaintiff raised by various parties during the suitability inquiry merely elaborated upon officials' transfer and resignation-based concerns; these original concerns were not dismissed, rather they became more fully fleshed out over the course of the investigation. Second, Plaintiff's behavior over the course of the suitability inquiry, specifically Plaintiff's initial approach toward his switchboard duties and his failure to report a traffic infraction, legitimately provided Defendant with additional cause for concern, arguably reflecting on Plaintiff's "suitability" to become an FBI Special Agent.  Thus, Plaintiff is unable to show that Defendant's legitimate reasons for taking action against Plaintiff were pretextual.

**B.     Retaliation Claims**

The Rehabilitation Act not only prohibits federal agencies from discriminating on the basis of disability, it also prohibits them from retaliating against employees as a form of employment discrimination.  *See Duncan v. WMATA*, 214 F.R.D. 43, 49 (D.D.C. 2003).  To state a claim for retaliation under the Rehabilitation Act, Plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) his employer took an adverse employment action against him;

and (3) a causal connection exists between the protected activity and the adverse action. *See Baker v. Potter*, 294 F. Supp. 2d 33, 40 (D.D.C. 2003); *Duncan*, 214 F.R.D. at 50 (D.D.C. 2003). Plaintiff may prove that Defendant retaliated against him either by providing circumstantial evidence subject to the *McDonnell Douglas* burden-shifting framework, or by providing direct evidence of retaliatory animus. *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000); *Dorchy*, 45 F. Supp.2d at 9; *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Direct evidence reflects discriminatory animus on its face. *Dang v. Inn at Foggy Bottom*, 85 F. Supp. 2d 39, 42 (D.D.C. 2000). A plaintiff who can provide such direct evidence can survive summary judgment. *Dorch*y, 45 F. Supp. 2d at 10.

The Court is cognizant that in this Circuit, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). However, in this case, a contested issue of material fact exists regarding direct evidence of Defendant's retaliatory motive such that summary judgment cannot be granted as to Plaintiff's retaliation claims. Plaintiff states that at a meeting on October 23, 2000, Mr. Higginbotham explicitly "informed [Plaintiff] that he would have let [Plaintiff] graduate if [Plaintiff] had not filed an EEO complaint." Pl.'s Exh. 1 ¶ 121 (Desmond Dec.); *see also* Pl.'s Stmt. ¶ 72. Defendant contests Plaintiff's assertion, stating that "AD Higginbotham denies making the statement." Def.'s Memo. at 36–37; Def.'s Exh. 19 at 192 (Higginbotham Dep.); Def.'s Reply at 21–22. Since the statement itself can be characterized as nothing other

than a direct statement of the causal connection[7] between Plaintiff's protected activity (filing an

EEO complaint) and an adverse action (not letting Plaintiff graduate) that was precedent to other

adverse actions, including terminating Plaintiff from the Special Agent program, the Court shall

deny Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claims.

## IV:  CONCLUSION

For the reasons set forth above, the Court shall GRANT Defendant's Motion for

Summary Judgment as to Plaintiff's discrimination claims under the Rehabilitation Act and

DENY Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claims under the

Rehabilitation Act.  An Order accompanies this Memorandum Opinion.


Date:   January 17, 2006



                                        _/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

---

[7] Defendant argues that Mr. Varnum's termination letter was written without knowledge of Plaintiff's EEO complaint and was predicated on documents received prior to the alleged conversation between Plaintiff and Mr. Higginbotham such that no causal connection exists between Plaintiff's EEO filing and his not being allowed to graduate and his ultimate termination.  Def.'s Memo. at 35–39; Def.'s Reply at 22–24.  However, this argument presumes that Mr. Higginbotham did not have the authority to retract his own six-page recommendation that Plaintiff be dismissed from the rolls of the FBI as a Special Agent that had been based on information Mr. Higginbotham received prior to talking with Plaintiff on October 4, 2000, and agreeing to reconsider his position.  This is a factual issue that clearly has not been established to the Court's satisfaction.